### UNITED STATES *v.* JONAS.

1. The act of March 3d, 1863, entitled " An act to prevent and punish frauds upon the revenue, to provide for the more certain and speedy collection of claims in favor of the United States, and for other purposes;" authorizing the Solicitor of the Treasury, " with the approval of the Secretary of the Treasury," to sell at public sale, after three months' advertisement, certain lands acquired by the United States, for debt, &c., qualifies and limits the powers of the said solicitor, given to him by the act of May 29th, 1830, creating his office and prescribing his duties, and authorizing him to sell such lands at private sale ; and *pro tanto* repeals it.

2. The former act being thus repealed, and the latter one only in force, the approval of the Secretary of the Treasury is an indispensable condition to the validity of a sale made under the act by the solicitor.

3. The purchaser is not bound to accept a deed unless there be written evidence of this approval.

4. The approval of the secretary is not a fact to be presumed because the deed of the solicitor is the deed of an official person, nor even because it recites that the sale was made in pursuance of the act of 1863.

ERROR to the Circuit Court for the District of Louisiana.

An act of May 29th, 1830,* authorized " the appointment of a Solicitor of the Treasury," prescribed his duties, &c.; and enacted, among other things, that—

" *The said solicitor* shall have charge of all lands and other property which have been or shall be assigned, set off, or conveyed to the United States in payment of debts; . . . and to sell and dispose of lands assigned or set off to the United States in payment of debts."

An act of March 3d, 1863, entitled " An act to prevent and punish frauds on the revenue, to provide for the more certain and speedy collection of claims in favor of the United States, and for other purposes,"† in its ninth section, enacts:

" That for the purpose of realizing as much as may properly be done, from *unproductive lands* and other property of the United States, acquired under judicial proceedings or otherwise, in the

---

* 4 Stat. at Large, 414.                    † 12 Id. 740, § 9.

collection of debts, the Solicitor of the Treasury be, and he is hereby authorized, *with the approval of the Secretary of the Treasury*, to rent for a period not exceeding three years, or sell any *such* lands, or other property, at public sale, after advertising the time, place, and conditions of such sale for three months preceding the same, in some newspaper published in the vicinity thereof, *in such* manner and upon such terms as may *in his judgment* be most advantageous to the public interests."

These acts being in force, the Solicitor of the Treasury put up for sale at auction certain land, with houses upon it, in New Orleans, which a debtor of the United States had conveyed to it in payment of debt. The land was bid off by George Jonas for $30,000. A deed was tendered to him. The deed purported to be made between—

" E. C. Banfield, Solicitor of the Treasury of the United States, duly appointed and qualified as such, and herein acting in such capacity for and on behalf of the United States of America, party hereto of the first part, and George Jonas, of the city of New Orleans, State of Louisiana, party hereto of the second part."

It properly recited that the land had been transferred and set over to the United States in payment of a debt due to it. It further recited that " under the provisions of section nine of an act of the Congress of the United States of America, entitled ' An act to prevent and punish frauds upon the revenue, to provide for the more certain and speedy collection of claims in favor of the United States, and for other purposes,' approved March 3d, 1863," and after due and legal notice on certain days and in certain newspapers (all particularly specified), the land had been exposed to sale at public auction, at the St. Charles Auction Exchange, and that Jonas had bought it.

It concluded:

" In witness whereof the said E. C. Banfield, Solicitor of the Treasury, as aforesaid, hath hereunto set his hand and caused his seal of office to be affixed the day and year first abovementioned."

And E. C. Banfield, Solicitor of the Treasury, signed it. But there was nothing in, on, or about, with or apart from the deed, to show that the sale was made with the approval of the Secretary of the Treasury. This deed Jonas refused to accept. The land was thereupon again put up for sale " on account and at the risk of the said George Jonas," and sold for $21,500; and the United States sued Jonas in the court below for $8500, the difference between the sums bid at the sales.

The point of the controversy was whether the consent and approval of the Secretary of the Treasury is necessary to authorize the sale and conveyance of property acquired by the United States under judicial proceedings, or otherwise, in the collection of debts.

The government contended, and asked the court so to charge, that the law did not require " a tender to defendant, as a part of the proof of title, of the *written approval* or *consent* of the Secretary of the Treasury to said sale or transfer of said property, *in any form*, in order to convey a complete title." This the court declined to do, and charged " that unless the deed of conveyance of the property executed by the solicitor, tendered by the United States to Jonas, at the time when it was tendered to him, bore upon its face, or by means of papers connected therewith, written proof, certain and patent to the defendant, that the Secretary of the Treasury had, in accordance with section nine of the act of March 3d, 1863, approved and authorized the sale of the property at auction by the Solicitor of the Treasury, then that no such deed was tendered as would convey to him a complete and undoubted title," and that he " could not be compelled to pay the loss in price resulting from the second sale." The United States excepted; and judgment having gone for the defendant the government brought the case here.

The question, therefore, for decision was, whether the approval of the Secretary of the Treasury was necessary to the sale or transfer of the property in question, and if so, whether it was incumbent on the plaintiffs to produce this

approval when the deed was tendered, in order to put the defendant in fault so as to subject him to suit.

*Mr. C. H. Hill, Assistant Attorney-General, for the United States:*

1. Had the act of 1863 not been enacted, the sale to Jonas would have been clearly binding on him, and the deed offered to him clearly good. Then the question is, whether the act of 1863 was intended to qualify and limit the powers originally given by the act of 1830, or whether rather it was intended to confer additional powers upon the Solicitor of the Treasury?

Repeals by implication of acts are not favored,* and yet if the act of 1863 has the force which the defendant contends it has, it must have repealed in a manner only implied, a large part of the act of 1830.

The two statutes may be reconciled by confining the act of 1863 to unproductive property only, which may be done by construing the words "and other property" as *ejusdem generis* with the property first mentioned, namely, *unproductive land;* that is to say, property of an uncertain value, which it is best should be sold at public auction; and leaving the powers of the Solicitor of the Treasury, under the act of 1830, to dispose generally of the property of the United States, unaffected by the later statute.

If the power conferred by the act of 1830 to sell this land remains unimpaired, then the recital in the deed that it was done under the act of 1863 cannot affect the validity of the sale, if the Solicitor of the Treasury had power to make it; nor would the fact that it was sold by auction; for the act of 1830 is silent as to the mode of sale.

If, however, the act of 1863 repeals the act of 1830, or qualifies it, the Solicitor of the Treasury has no longer power to sell any of the property of the United States by private sale. This restriction would cripple his power to an extent that it can be well conceived would often be very detrimental to the public.

---

* United States *v.* Tynen, 11 Wallace, 92.

2. But if this sale, in order to be sustained, must have been made in conformity with the act of 1863, then the court will presume the approval of the Secretary of the Treasury. It is not necessary that his approval should appear either in the conveyance or be matter of record in any respect.

The Solicitor of the Treasury is a public officer performing public duties, and it is a very maxim of the law that where acts are of an official nature, or require the concurrence of official persons, a presumption arises in favor of their due execution. In these cases the rule is "*Omnia præsumuntur rite et solenniter esse acta donec probetur in contrarium.*"*

The approval of the Secretary of the Treasury is not a muniment of title, but is a matter collateral to the title, with which the grantee of the property had nothing to do. The deed of conveyance of the Solicitor of the Treasury transferred the title. The question whether the secretary had approved it, is a matter between the government and the solicitor, and not a thing essential in order to make title.

*Mr. P. Phillips, contra.*

Mr. Justice DAVIS delivered the opinion of the court.

It is quite apparent that the law will not compel the purchaser in this case to comply with the terms of sale and accept the deed offered, unless the Solicitor of the Treasury, who made the sale and executed the deed, has undoubted authority to do both these things. The officer was created by act of Congress of 29th of May, 1830, and among the duties assigned to him by the first section is the charge of property conveyed to the United States in payment of debts, with power to sell and dispose of the same. It may be that it was the intention of Congress that the important powers thus conferred should be exercised independently of the

---

* Bank of the United States *v.* Dandridge, 12 Wheaton, 69, 70; Apthorp *v.* North, 14 Massachusetts, 167; Broom's Maxims (6th American. edition), 908, 909, and cases there collected.

Secretary of the Treasury, although it is clearly the policy of the law to hold the head of the department responsible for the proper administration of the governmental functions which pertain to it.   It is, however, not necessary to consider the point, because the act of the 3d of March, 1863, to "prevent frauds on the revenue and provide for the certain and speedy collection of claims in favor of the United States," has not only in terms placed the Solicitor of the Treasury in subordination to the secretary in the matter of selling the property of the United States taken in payment of debts, but has deprived him of the power of selling at private sale at all—a power liable to abuse, and which the interests of the government require should not be confided to any one. In the ninth section of this act the solicitor is authorized to sell, with the approval of the secretary, and not then except at public sale, on three months' notice of the time, place, and terms of sale, advertised in some newspaper published in the vicinity of the property.   It is clear that this latter act was intended to qualify and limit the powers given by the act of 1830.   It covers the whole subject of the disposition of lands acquired for debts due the government, and embraces new and salutary provisions in relation to their sale, and shows clearly that Congress, instead of conferring additional powers, intended to limit those already conferred.

Such being the case, the latter act must operate as a repeal *pro tanto* of the act of 1830.

It is urged that the two acts can be reconciled if the latter one is confined to unproductive property, but neither the letter nor spirit of this act would warrant any such interpretation.   It is true the sale or lease for a limited period of unproductive lands is provided for, but the same provisions apply to other property obtained by the government in payment of debts due it.   Indeed, no good reason can be assigned why the disposition of unproductive lands should be subject to the approval of the secretary, and other property, which, in this case, consisted of valuable real estate in the city of New Orleans, with buildings on it, be left to the sole disposal of a subordinate officer.   All property of what-

ever kind obtained in the way pointed out is embraced
within the scope of the statute. If the Congress of 1830
intended that the Solicitor of the Treasury should be the
sole judge of the propriety of selling the property of the
United States taken in payment of debts, the Congress of
1863 thought proper to abandon that policy, and to declare
that in no case should there be a sale without the approval
of the Secretary of the Treasury. It went further and said
that all sales should be at public auction, and gave the power
to lease for a limited time, but whether the property were
leased or sold, the secretary should be first consulted and
his consent obtained, and all persons given a fair and equal
opportunity of buying. The system thus inaugurated did
away with the objections to private sales, and made the Sec-
retary of the Treasury responsible, as he should be, for the
proper administration of this branch of the public service.

The next point to be considered is, whether the defend-
ant was obliged to comply with the terms of sale on tender
of the deed. This deed was executed by E. C. Banfield,
and recites that, acting in the capacity of Solicitor of the
Treasury, under the ninth section of the act of 1863, he had
caused the property to be exposed at public sale, but it does
not contain any recital that the secretary authorized the sale,
nor was any evidence offered to the defendant in connection
with the deed that this authority had been obtained.

It is manifest, if any effect is to be given the act invoked
by the solicitor as the basis of his authority, that he could
not proceed at all without the approval of his superior. The
legislation of Congress would be wholly ineffectual to pre-
vent the evils which it was designed to remedy, if this ap-
proval should not be treated as a substantial requirement, a
thing essential to give validity to the sale. The question is
one of power, and the power is given to sell when the secre-
tary thinks it advisable to do so. His approval is a condi-
tion precedent, without which the solicitor has no authority
whatever to act.

It is said, however, if this be so, that the court will pre-

sume this approval, and that it is not necessary that it should appear either in the conveyance or in any other mode. It would defeat the obvious purpose of Congress, which is to be considered in the construction of a statute, to dispense with proof of this approval. One of the main objects of the statute was to subject the action of the solicitor to the control of the secretary in a matter of great public concern, in which he had heretofore acted without control. This change of the system contemplated a change in the mode of proceeding on the part of the solicitor. If this were not so, there would be no security that the solicitor would not continue to sell property as he had been accustomed to sell it. Indeed, the very sale in question is defended on the ground that the power conferred by the act of 1830 remains unimpaired by the act of 1863, and the action of the solicitor in this case furnishes a potent argument against the rule of presumption contended for. As the important power of selling the property of the United States acquired in payment of debts can only be exercised by the solicitor with the approval of the secretary, there would seem to be the best of reasons for requiring some written evidence of this approval, not only for the security of the purchaser, but for the protection of the government.

The defendant, therefore, is not in default, because there is nothing in the record to show that this consent of the secretary had been obtained.

If the authority to make the sale had been delegated to the solicitor alone, and its exercise confided to his discretion, his acts would carry with them *primâ facie* evidence that they were within the scope of his authority. But where the power is divided there must be joint action before any presumption can arise.

JUDGMENT AFFIRMED.